UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-----------------------------------x
                                   :
JANET McKINSTRY,           :
                                     :
         Plaintiff,     :
                                     :
v.                         :    Civil No. 13cv200 (AWT)
                                   :
SHERIDEN WOODS HEALTH CARE    :
CENTER, INC.,           :
                                   :
         Defendant.     :
                                   :
-----------------------------------x

## RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Janet McKinstry brings this action against defendant Sheriden Woods Health Care Center, Inc. ("Sheriden Woods") asserting claims for discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60 et seq. (First Count); breach of oral contract (Second Count); promissory estoppel (Third Count); and tortious breach of the implied covenant of good faith and fair dealing (Fourth Count). The court previously granted the defendant's motion to dismiss the Second, Third, and Fourth Counts. (See Doc. No. 22.) Sheriden Woods now moves for summary judgment on the First Count. For the reasons set forth below, the motion is being granted.

I.    **FACTUAL BACKGROUND**

The plaintiff was a certified nurse assistant ("CNA") at Sheriden Woods.  She began working there in 1984 as a CNA.  She moved to Ohio in 1994 but returned in 1996 and resumed her employment as a CNA at Sheriden Woods, which continued until her employment was terminated on July 7, 2010.

Sheriden Woods has three units, and each unit has a charge nurse.  Three CNAs are assigned to each shift, and the charge nurse oversees the job performance of the CNAs.  In 2010, the plaintiff worked the 3:00 p.m. to 11:00 p.m. shift.  The second CNA assigned to that shift was Kathy LaPointe-McKinstry ("LaPointe-McKinstry"), the plaintiff's daughter-in-law.  The third CNA was Dorothy Chamberlain ("Chamberlain").  From March to June 2010, while Chamberlain recovered from a knee surgery, Christine Welch ("Welch") filled in for her as the third CNA on the 3:00 p.m. to 11:00 p.m. shift.  In 2010, Jillian Onofrio ("Onofrio") was the charge nurse for the plaintiff's shift and oversaw her job performance.

Prior to January 2010, while employed at Sheriden Woods, the plaintiff received a number of performance evaluations and a written warning that noted her difficulties interacting in a positive manner with some of her co-workers.  In 1986, one performance evaluation reflects that the plaintiff received a "C+" in "Cooperation with other staff" and a "C" in "General

Attitude" and includes a comment that "Janet co-operate[s] well with staff members whom she is close to.  She will co-operate with other staff members but to a lesser degree." (Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem."), Ex. E, Doc. No. 38-5, at Sheriden 0000406.) The evaluation also notes that "Janet's affect is interpreted as angry and unapproachable by most of her co-workers.  Needs to resolve personality conflicts, acquire a more open, friendly approach and smile more often."  (Id. at Sheriden 000407.)

In 2000, the plaintiff received a written warning requesting that she treat everyone with "courtesy, respect [and] dignity always." (Def.'s Mem., Ex. F, Doc. No. 38-6, at Sheriden 0000044.)  The warning states that "[f]rom this point on any of behavior (i.e. threatening, name calling, defacing personal property, etc.) while on duty will be dealt with swiftly [and] appropriately, what ever level [the plaintiff] ha[s] participated in this on going 'feud' over the past has now have to end . . . ." (Id. at Sheriden 0000045.)

In 2006, a performance evaluation states that the plaintiff "[h]as trouble working with some of her peers[.]"  (Id. at Sheriden 0000396.)  The evaluation also states that the plaintiff is "an excellent worker" and is "thoughtful [and] kind to the residents [and] families" but "[a]t times she is unaccepting of other CNA[]s, and finds it difficult to work with

them." (Id. at Sheriden 0000400.)  The evaluation states that
the plaintiff needs to "[t]ry to be more accepting of CNA[]s
that are not as thorough in care as she is."  (Id.)

A 2009 performance evaluation, while stating that the
plaintiff's "work practice is excellent[,]" also requests the
plaintiff to "work on co-worker communication" and to "improve
communication skills [with] coworkers."  (Def.'s Mem., Ex. G,
Doc. No. 38-7, at Sheriden 0000381.)

In January 2010, the plaintiff received three separate
performance-based written warnings: two on January 6, 2010 and
one on January 31, 2010.  The first warning states that the
plaintiff left her unit without notifying Onofrio, the charge
nurse.  The second warning states that the plaintiff was sitting
in a resident's room talking to staff members with the door
closed and that residents had reported that her conversations
with staff members had made the residents uncomfortable.  The
third warning states that the plaintiff was disrespectful and
insubordinate to Onofrio.  All three warnings were written by
Onofrio and given to the plaintiff by Janet Hackett ("Hackett"),
the Director of Staff Development at Sheriden Woods.

In addition, Onofrio also wrote a note, dated January 6,
2010, to Hackett that documented her complaints about the
plaintiff.  In the note, Onofrio expressed her concerns with the
plaintiff's "unprofessional behavior" and "her disrespect to

4

[Onofrio] as the charge nurse." (Def.'s Mem., Ex. I, Doc. No. 38-9, at Sheriden0000712.) The note further states that the unit was "completely different" on the days when the plaintiff did not work, and that

> [t]he friction-problems Janet['s] attitude and actions have caused on the unit has taken away staff members ability to care for [the residents] to the best of everyone['s] ability and at times caused residents to be angry with each other due to her actions and comments and her continuing to bring her family problems to work that in turn, cases conflict with Kathy [LaPointe-]McKinstry, especially because they both work on the same unit.

(Id. at Sheriden0000713.)

In 2010, Albert Mislow ("Mislow") was the Administrator at Sheriden Woods. He testified that in June 2010 the plaintiff's co-workers, including LaPointe-McKinstry and Onofrio, complained about the plaintiff's treatment of co-workers and residents. LaPointe-McKinstry also told the plaintiff that she had complained to Mislow that she felt the plaintiff was bullying or harassing her. In the notes Onofrio kept concerning the plaintiff's conduct, she wrote on June 10, 2010 that the plaintiff "refuse[d] to work together or help other CNA[]s, Kathy [LaPointe-McKinstry] has made complaints about this, I thought it was between her [and] Kathy M but she did it tonight with CNA Genev[iev]e." (Def.'s Mem., Ex. K, Doc. No. 38-11, at SHERIDEN0000707.)

5

On June 22, 2010, after receiving complaints from the plaintiff's co-workers, Mislow and Doreen Christiano ("Christiano"), Director of Human Resources for Athena Health Care Systems (the parent company of Sheriden Woods), met with the plaintiff and suspended her pending an investigation of the complaints against her.  Thereafter, based on statements from staff members about the plaintiff's conduct, Mislow and Kathy Moon ("Moon"), Human Resources Director at Sheriden Woods, compiled a list of interview questions to ask staff members to determine whether they had experienced harassment, and if so by whom.  Initially, Mislow and Moon interviewed five individuals. Of those five, four answered that they did not feel harassed.

After she was suspended, the plaintiff provided Mislow with a 10-page rebuttal letter that raised 23 separate points on various topics regarding the workplace.  Mislow and Moon then expanded their list of questions based on the plaintiff's rebuttal letter and interviewed nine additional staff members. Of those nine, five answered that they had felt harassed and named the plaintiff.  Mislow and Christiano also met with staff members whose names were mentioned in the plaintiff's rebuttal letter.[1]

---

[1] The record does not show whether the nine additional staff members interviewed overlapped with the staff members mentioned in the plaintiff's rebuttal letter.

On July 7, 2010, Mislow and Christiano met again with the plaintiff to inform her that they had decided to terminate her employment.  The termination evaluation states that the plaintiff's employment was terminated due to "inappropriate/harassment behavior."  (Def.'s Mem., Ex. M, Doc. No. 38-13, at Sheriden 0000061.)

The plaintiff asserts that she was replaced by Welch, who was in her 20s at the time; that she was discharged because of her age; and that the reasons given for her discharge were pretextual.

## II.  LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a).  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994).  When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987).  Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not

to deciding them. Its duty, in short, is confined . . . to
issue-finding; it does not extend to issue-resolution." <u>Gallo</u>,
22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be
resolved is both genuine and related to a material fact.
Therefore, the mere existence of <u>some</u> alleged factual dispute
between the parties will not defeat an otherwise properly
supported motion for summary judgment.  An issue is
"genuine . . . if the evidence is such that a reasonable jury
could return a verdict for the nonmoving party." <u>Anderson</u>, 477
U.S. at 248 (internal quotation marks omitted).  A material fact
is one that would "affect the outcome of the suit under the
governing law." <u>Anderson</u>, 477 U.S. at 248.  Only those facts
that must be decided in order to resolve a claim or defense will
prevent summary judgment from being granted.  Immaterial or
minor facts will not prevent summary judgment.  <u>See</u> <u>Howard v.</u>
<u>Gleason Corp.</u>, 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary
judgment, the court must "assess the record in the light most
favorable to the non-movant and . . . draw all reasonable
inferences in its favor." <u>Weinstock v. Columbia Univ.</u>, 224 F.3d
33, 41 (2d Cir. 2000)(quoting <u>Delaware & Hudson Ry. Co. v.</u>
<u>Consolidated Rail Corp.</u>, 902 F.2d 174, 177 (2d Cir. 1990)).
However, the inferences drawn in favor of the nonmovant must be

supported by evidence.  "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment.  Stern v. Trustees of Columbia University, 131 F.3d 305, 315 (2d Cir. 1997) (quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990)).  Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant.  Anderson, 477 U.S. at 252.

**III. DISCUSSION**

Under the ADEA, it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ." 29 U.S.C. § 623(a)(1).  The protections of the ADEA reach individuals who are at least 40 years old.  See 29 U.S.C. § 631(a).  Under CFEPA, "[i]t shall be a discriminatory practice in violation of this section . . . [f]or an employer . . . to refuse to hire . . . or to discharge from employment any individual or to discriminate against such individual . . . because of the individual's race, color, religious creed, age . . . ." Conn. Gen. Stat. § 46a-60(a)(1).

In the Second Circuit, ADEA disparate treatment claims are analyzed using the burden-shifting framework for Title VII

claims set forth in McDonnell Douglas Corp. v. Green, 411 U.S.
792 (1973), as modified by the Supreme Court's subsequent
decision in Gross v. FBL Fin. Servs., 557 U.S. 167 (2009).  See
Gorzynski v. JetBlue Airways Corp., 596 F3d 93, 105-06 (2d Cir.
2010).  "The analysis of discrimination . . . under CFEPA is the
same as under Title VII."  Kaytor v. Electric Boat Corp., 609
F.3d 537, 556 (2d Cir. 2010) (citing Craine v. Trinity College,
259 Conn. 625, 637 n.6 (2002)).  Thus, the court analyzes the
plaintiff's ADEA and CFEPA claims together.

    Under the McDonnell Douglas burden shifting framework, a
plaintiff must first make out a prima facie case by
demonstrating the following: "(1) she was within the protected
class; (2) she was qualified for the position; (3) she was
subject to an adverse employment action; and (4) the adverse
action occurred under circumstances giving rise to an inference
of discrimination."  United States v. Brennan, 650 F.3d 65, 93
(2d Cir. 2011).  "[The] plaintiff's prima facie burden [i]s
minimal and de minimis."  Woodman v. WWOR-TV, Inc., 411 F.3d 69,
76 (2d Cir. 2005) (internal quotation marks omitted).  After the
plaintiff has met the initial burden of establishing a prima
facie case, "the burden then shifts to the employer to
articulate some legitimate, nondiscriminatory reason for the
adverse employment action."  Brennan, 650 F.3d at 93.  "Once
such a reason is provided, the plaintiff can no longer rely on

the prima facie case, but may still prevail if she can show that
the employer's determination was in fact the result of
discrimination." Gorzynski, 596 F.3d at 106.  At this step,
"Gross makes clear that 'a plaintiff bringing a disparate-
treatment claim pursuant to the ADEA must prove, by a
preponderance of the evidence, that age was the 'but-for' cause
of the challenged adverse employment action' and not just a
contributing or motivating factor." Id. (quoting Gross, 557 U.S.
at 180.)

        The same but-for standard applies to the plaintiff's CFEPA
claim.  See Rubinow v. Boehringer Ingelheim Pharm., Inc., 496
Fed. Appx. 117, 118 (2d Cir. 2012) (discussing the plaintiff's
ADEA claim and CFEPA claim together and noting that the
plaintiff must prove age was the "but-for" cause of the
challenged adverse employment action); Fasoli v. City of
Stamford, No. 3:11-CV-767 (CSH), 2014 WL 6808679, at *25 n.34 (D.
Conn. Nov. 24, 2014) ("[B]ecause the Second Circuit has, on
multiple occasions, applied the but-for standard to [CFEPA]
claims, the [c]ourt continues to do so here until a Connecticut
appellate court rules otherwise.") (internal quotation marks and
citation omitted).

        For purposes of the instant motion, the court assumes that
the plaintiff has established a prima facie case.  Here, the
defendant has offered a legitimate, non-discriminatory reason

for the plaintiff's discharge, namely "inappropriate/harassment behavior."  (Def.'s Mem., Ex. M, Doc. No. 38-13, at Sheriden 0000061.)  Thus, the court proceeds to the ultimate question of whether the plaintiff has presented evidence sufficient for a reasonable jury to conclude that the defendant discharged her because of her age.  The court concludes that the plaintiff has not done so.

The plaintiff asserts that in 2010 she was one of the oldest employees at Sheriden Woods, and the defendant targeted her, and ultimately discharged her, because of her age.  As support, the plaintiff points out that in her 26 years of employment at Sheriden Woods, she only received four written warnings: one in May 16, 2000 and three in January 2010.  But Sheriden Woods did not terminate the plaintiff's employment because of the number of written warnings she received; rather, she was discharged because of her "inappropriate/harassment behavior" towards her co-workers.  (Def.'s Mem., Ex. M, Doc. No. 38-13, at Sheriden 0000061.)  The plaintiff's employment record reflects that, while two of the warnings appear not to be based on her behavior towards co-workers, her supervisors had consistently noted her poor relations with her co-workers throughout her employment at Sheriden Woods.  In a 1986 evaluation, the plaintiff received a "C+" in "Cooperation with other staff."  (Def.'s Mem., Ex. E, Doc. No. 38-5, at Sheriden

0000406.)  The evaluation also states that most of her co-workers find her "unapproachable" and that she "[n]eeds to resolve personality conflicts, acquire a more open, friendly approach and smile more often."  (Id., at Sheriden 0000407.) The plaintiff's May 16, 2000 written warning requests that she treats everyone with "courtesy, respect [and] dignity always." (Id., Ex. F, Doc. No. 38-6, at Sheriden 0000044.)  A 2006 performance evaluation notes that the plaintiff "[h]as trouble working with some of her peers[.]"  (Id. at Sheriden 0000396.) A 2009 performance evaluation asks the plaintiff to "please work on co-worker communications[.]"  (Id., Ex. G, Doc. No. 38-7, at Sheriden 0000381.)  Thus, the plaintiff's poor relations with co-workers were noted in 1986, 2000, 2006, and 2009.  Complaints of the same nature also are reflected in the January 2010 warnings.[2]

The plaintiff points out that her employment record "is flush with praise and glowing recommendations from co-workers, employers, residents and residents' family members regarding both her professional and personal attitude at work." (Memorandum of Law in Opposition, Doc. No. 45 ("Pl.'s Opp."), at 13-14.)  This is true, but it is also true that the plaintiff's

---

[2] While the January 6, 2010 written warnings state that the plaintiff did not follow the proper protocol, in a hand-written note dated the same day, Onofrio expresses her concern about the plaintiff's "unprofessional behavior" and her "disrespect to [Onofrio] as the charge nurse."  (Def.'s Mem., Ex. I, Doc. No. 38-9, at Sheriden0000712.)  The January 31, 2010 warning also states that the plaintiff had been disrespectful and insubordinate to Onofrio.

employment record as a whole shows that she got along with some
co-workers and not others.  A comment in the plaintiff's 2006
performance evaluation summarizes her job performance and
relations with her co-workers:

> Janet is an excellent worker who gives all
> residents the care [and] attention they need.  She is
> observant and report[s] all changes in her residents.
> She is thoughtful [and] kind to the residents [and]
> families.  At times she is un[ac]cepting of other
> CNA[]s, and finds it difficult to work with them.

(Def.'s Mem., Ex. F, Doc. No. 38-6, at Sheriden 0000400.)

Also, the plaintiff asserts, as evidence that she was
targeted because of her age, that Hackett "made several age-
based comments . . . including 'out with the old, in with the
new.'" (Pl.'s Opp., at 15.)  The plaintiff submits an affidavit
from another CNA who avers that she overheard Hackett say that
"all the CNAs were 'a dime a dozen' and could be readily
replaced." (Affidavit of Christine Laferriere, Doc. No. 45-10,
¶ 7.)  However, "allegedly discriminatory comments made by a
nondecisionmaker are, as a matter of law, insufficient to raise
an inference of discrimination[,]" De la Cruz v. City of New
York, 783 F. Supp. 2d 622, 643 (S.D.N.Y. 2011), and here it is
undisputed that Mislow and Christiano made the decision to
terminate the plaintiff's employment.  Additionally, the
plaintiff asserts that Hackett directed Onofrio to issue written
warnings against the plaintiff.  But Onofrio testified that

"Hackett had said jokingly to me if I didn't write Janet McKinstry up, she is going to write me up because I was known to be too lenient."  (Deposition of Jillian Onofrio, Ex. 6, Doc. No. 45-12, 32:17-25.)  Onofrio then explained that "Janet [Hackett] said if you don't start writing -- it wasn't specified to Janet [McKinstry], either, it was the whole if you don't start writing these girls up for the things they do wrong, then you are going to get written up.  She said it and, you know, started laughing."  (Id., 33:5-9.)  Thus, Onofrio understood Hackett to instruct her to issue written warnings to any CNA who fails to follow protocol, not just the plaintiff.

The plaintiff also asserts that Onofrio only issued written warnings against the plaintiff and not against LaPointe-McKinstry or Welch.  In the January 6, 2010 note Onofrio wrote to Hackett, Onofrio states that "I am fair with the CNA[]s that work on the unit but Janet seems [to] strive o[n] putting others down.  She also tries to use tension between Kathy [LaPointe-McKinstry] and I by telling Kathy str[a]ight lies that I have supposedly said about her."  (Def.'s Mem., Ex. I, Doc. No. 38-5, at Sheriden 0000712.)  Onofrio states that "[o]n the days when Janet is not working, the unit is completely different."  (Id.) Thus, it appears that Onofrio's complaints were a product of the plaintiff's conduct rather than the conduct of LaPointe-McKinstry or Welch.  In the absence of any evidence in the

15

record that suggests that the conduct of LaPointe-McKinstry or Welch would have caused Onofrio to issue written warnings, no reasonable jury could find that Onofrio had targeted the plaintiff.  Moreover, even if Onofrio had targeted the plaintiff, nothing in the record suggests that it was because of the plaintiff's age.

The plaintiff also asserts that as a part of the defendant's investigation of the complaints against her, Mislow and Moon conducted a second round of interviews in order to "find support to terminate [the plaintiff]" "after the first [round] did not provide results sufficient to terminate [her] employment[.]"  (Pl.'s Opp., at 17.)  Namely, only one out of the five individuals interviewed in the first round answered yes to the question "Do you feel harassed?" and five out of nine individuals interviewed in the second round answered yes to the question.  However, the second round of interviews was conducted with additional interview questions based on the plaintiff's rebuttal letter.  The defendant has proffered a legitimate, non-discriminatory reason for conducting a second round of interviews and evidence in support of that reason.  The plaintiff has proffered no evidence to show that the additional interviews were conducted to obtain support to discharge the plaintiff because of her age.

The plaintiff also has proffered no evidence that suggests

her age was a factor that Mislow, Moon, or Christiano took into account during the investigation.  The court notes that Mislow was about 52 years old at the time he and Christiano decided to terminate the plaintiff's employment in 2010 so he was a member of the same protected class as the plaintiff.[3]  An inference against age discrimination can be drawn "where the person who participated in the allegedly adverse decision is also a member of the same protected class."  Drummond v. IPC Intern., Inc., 400 F. Supp. 2d 521, 532 (E.D.N.Y. 2005) (citing Marlow v. Office of Court Admin., 820 F. Supp. 753, 757 (S.D.N.Y 1993), aff'd, 22 F.3d 1091 (2d Cir. 1994)).

Moreover, the plaintiff testified that Mislow and Christiano terminated her employment based on orders from unknown individuals at Athena Health Care Systems; that Mislow was a "good guy" who "just did his job"; and that Mislow and Christiano are "[b]oth nice people.  They were just told to do something . . . ."  (Def.'s Mem., Ex. B, Doc. No. 38-1, 94:15; 99:17-18.)  The plaintiff's testimony shows that she did not believe that Mislow and Christiano were personally motivated to terminate her employment because of her age; rather, she said that they were told to terminate her employment by someone else.  However, the plaintiff has proffered no evidence showing that another decision maker participated in her discharge.

_____

[3] At Mislow's May 9, 2014 deposition, he testified that he was 56 years old.

Finally, the plaintiff asserts that the reasons given for her discharge were pretextual.  However, "a reason cannot be proved be a pretext <u>for discrimination</u> unless it is shown <u>both</u> that the reason was false, <u>and</u> that discrimination was the real reason."  <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 515 (1993) (emphasis in original).  For the reasons discussed above, the plaintiff has failed to produce evidence showing that the reasons for discharging her were false and also failed to produce evidence that could support an inference of discrimination.  The fact that the plaintiff was replaced by Welch, who is younger, is not sufficient standing alone to defeat summary judgment.  <u>See</u> <u>Fagan v. New York State Elec. & Gas Corp.</u>, 186 F.3d 127, 134 (2d Cir. 1999) ("The replacement of an older worker with a younger worker or workers does not itself prove unlawful discrimination.").

## IV.  CONCLUSION

Accordingly, Motion for Summary Judgment (Doc. No. 36) is hereby GRANTED.  Judgment shall enter in favor of Sheriden Woods Health Care Center, Inc. as to all of the plaintiff's claims.

The Clerk shall close this case.

It is so ordered.

 Signed this 6th day of March 2015, at Hartford, Connecticut.

_____/s/_____
Alvin W. Thompson
United States District Judge